# IN THE COURT OF APPEALS OF IOWA

No. 22-0541
Filed December 21, 2022

IN RE THE MARRIAGE OF JACOB DANIEL WIELAND
AND ASHLEY ANN WIELAND

Upon the Petition of
JACOB DANIEL WIELAND,
        Petitioner-Appellee,

And Concerning
ASHLEY ANN WIELAND,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Washington County, Myron Gookin,

Judge.


        The wife challenges the physical-care provision and asks to be credited an

equitable amount of the husband's debt that was paid off with marital funds.

**AFFIRMED.**


        William N. Toomey of Phelan Tucker Law, LLP, Iowa City, for appellant.

        Ryan C. Shellady and Jacob R. Koller of Simmons Perrine Moyer Bergman

PLC, Cedar Rapids, for appellee.


        Heard by Bower, C.J., and Greer and Badding, JJ.

**GREER, Judge.**

Ashley Wieland appeals the decree dissolving her marriage to Jacob Wieland. She contests the district court's award of joint physical care, claiming she should be the physical-care parent for the parties' two minor children. She also asks to be credited for half of the approximately $63,000 of mortgage debt on Jacob's farm that she claims was paid down with marital funds. Jacob asks us to affirm the dissolution decree and award him $8000 in appellate attorney fees.

## I. Background Facts and Proceedings.

Ashley and Jacob were married in September of 2011. Two children were born of the marriage, E.W. and F.W., in 2012 and 2014 respectively.

Based on an incident in December 2019, Jacob pled guilty to domestic abuse assault causing bodily injury with Ashley as the victim; he was given a deferred judgment and placed on probation. As a result, a no-contact order was issued between Ashley and Jacob.

Then, in July 2020, Jacob petitioned for dissolution.

The district court entered an order on temporary matters in September, giving Jacob and Ashley joint legal custody and joint physical care. The parties, who reside only a few miles apart, were ordered to share physical care based on a 2-2-3 schedule.[1] The no-contact order remained in place, but the court allowed Jacob and Ashley to communicate about the children via text messages. Jacob was ordered to pay $650.78 in monthly child support.

---

[1] The schedule rotated on a two-week cycle, with one parent having the children Monday morning until Wednesday morning and then Friday morning until Monday morning one week, and then switching on the second week so that parent had the children just Wednesday morning until Friday morning during week two.

Ashley filed a motion to enlarge or amend the order on temporary matters, claiming the district court "minimize[d] the significance of the domestic abuse and ignore[d] the applicable governing statutes." *See* Iowa Code § 598.41(1)(b) (2020) ("[I]f the court finds that a history of domestic abuse exists, a rebuttable presumption against the awarding of joint custody exists."). She noted her prior request that the court take judicial notice of the criminal complaints, guilty plea, and sentencing order from the 2019 domestic abuse assault and claimed it was error for the court not to do so. It seems Ashley wanted a change in physical care and possibly of legal custody as well.[2] Jacob resisted, claiming the district court was "aware of the reciprocal allegations of abuse" and properly determined joint physical care was in the best interests of the children.

The court entered an order finding "that [Jacob] has committed domestic abuse against [Ashley]" but that Jacob "rebutted the presumption against joint custody based on [his] affidavits and the information available to the court." The court otherwise declined to amend or enlarge the order on temporary matters.

In the days leading up to the November 2021 dissolution trial, Jacob and Ashley filed a partial stipulation,[3] in which they agreed to joint legal custody of the children. They also agreed on a schedule to share holidays and extended

---

[2] In her Iowa Rule of Civil Procedure 1.904 motion, Ashley asked the court to "enter temporary orders in conformity with the proposal Ashley filed August 7, 2020," but we have been unable to locate the referenced proposal in our record. We note, however, that in her responses to Jacob's petition for dissolution, Ashley asked for "sole legal custody of the minor children, and if not, that the parties should be awarded joint legal custody" and "physical care of the minor children subject to the visitation rights of [Jacob] that are appropriate under the circumstances."

[3] The district court later adopted and incorporated the stipulation as part of the dissolution decree.

parenting time during summer breaks, their right to communicate with the children while they are in the other parent's care, access to information about the children, and the children's school district. Neither Jacob nor Ashley requested spousal support, and the parties agreed that certain property was personal and would not be subject to division as part of the dissolution, including some vehicles and bank accounts. Additionally, in regard to a farm Jacob owns with his brother—each having a 50% interest—it was confirmed Jacob would be "awarded his interest in this real estate free and clear of all right, title and interest of Ashley," as was laid out in the parties' premarital agreement.

Jacob and Ashley did not agree on physical care; Ashley asked that she be awarded physical care while Jacob asked the court to order joint physical care and maintain the same 2-2-3 schedule the parties had under the temporary order. Ashley also asked the court to "reimburse[ her] a fair and equitable amount for [her] contribution to the equity accumulated during the course of [the] marriage in the farmland now titled in part to Jacob." Both Jacob and Ashley asked the district court to award them trial attorney fees.

During the three-day trial, the district court heard testimony from Ashley, Jacob, and eleven other witnesses. Jacob testified that while he was historically employed as a truck driver,[4] he recently took a local job with hours Monday through Friday, 7:00 a.m. to 4:00 p.m. On occasion he works overtime, and he usually works Saturday mornings on weekends Ashley has the children. Jacob also farms

---

[4] Jacob worked as an over-the-road truck driver for approximately four years after the parties had a child. He continued working as a truck driver after that but drove local routes.

with his brother in a row-crop operation and keeps a few head of cattle. Ashley works at a local bank and is employed banker's hours: 7:30 a.m. to 4:30 p.m. Monday through Thursday, 7:30 a.m. until about 5:30 p.m. on Fridays, and every third Saturday from 8:00 a.m. to noon.

At the time of the dissolution trial, Jacob rented an acreage from his father—which had been the marital home—where he resides with his girlfriend. Jacob's home is just a few miles from Ashley's parents' home—where Ashley was residing.[5] When he was employed as an over-the-road truck driver, Jacob was sometimes gone for days at a time, but when he was home, he was a hands-on parent who cooked, cleaned, and engaged with the children. Still, Ashley was the parent in charge of providing care most of the time, which included things like grocery shopping for the family, picking the kids up from daycare, and getting them ready in the mornings.

Both Ashley and Jacob testified as to multiple physical altercations in their relationship. Jacob recited December 26, 2019 as the date he and Ashley separated, noting that with the allegation of domestic abuse and the resulting no-contact order, he moved out of the family home then. He described being in a verbal altercation with Ashley on the stairs when she "kicked [him] backwards down the stairs." When Ashley came downstairs, the "argument ensued" with both parties "pushing and shoving." He described accidentally hitting Ashley with his forearm when he tried to block a hit from her. Then, to prevent her from calling 911, Jacob admitted throwing Ashley's phone. 911 was called, and Jacob was

---

[5] Ashley was saving money to move out of her parents' home; she did not have a home picked out but she intended to stay in the same community.

arrested for domestic abuse assault, to which he eventually pled guilty and received a deferred judgment. Jacob also briefly testified that Ashley kicked out his front teeth in 2017; he provided no other details. Ashley described the December 2019 incident differently; she testified Jacob was angry and "end[ed] up slapping [her] on the arm" and "hitting [her] on the head" and that, when he had her and the children cornered on the stairs, he began punching the wall next to one of the children's head. Ashley testified that was when she shoved Jacob, who fell the three or four stairs from the landing. She agreed Jacob "fought the phone away from [her]" and testified she was eventually able to use Jacob's phone to call 911. Ashley admitted kicking out Jacob's front teeth in 2016 or 2017, testifying it was "self-defense" because Jacob "pinn[ed] [her] against the couch in front of the children." Both parties agreed that after the December 2019 incident, there were no further issues and no violations of the no-contact order.

Between the testimony of Ashley, Jacob, and their numerous witnesses, a number of unflattering stories about the parents and their use of alcohol were brought to the court's attention. But each parent also had a number of witnesses who praised their parenting and the way they engage with E.W. and F.W. As the district court summed it up, "Each party had a lot of say about the other, mostly negative. Non-party witnesses generally testified positively or negatively along family and friendship lines."

In regard to the farm Jacob owns with his brother, Ashley testified she contributed money to Jacob's farming operation, offering evidence of times she transferred money from her individual account or from her and Jacob's joint account into the farm account. In his testimony, Jacob denied Ashley ever

"deposited her own money into it." He claimed there were times Ashley used the farm account to make a personal purchase and then later transferred money over to the farm account as reimbursement. Additionally, Jacob testified that money generated by the farm paid for the family's cell phone bills, home internet, and vehicle insurance.

In the dissolution decree, which the district court filed in January 2022, the court recognized the parties' "somewhat tumultuous past," including both of their complaints about physical altercations between the two and each parent's occasional misuse of alcohol. But the court was more focused on the parents' recent history, noting, "Over the past year or so, both parties have improved their behavior toward one another and their behaviors in general." Additionally, during the approximately fourteen months the temporary orders were in place, Jacob and Ashley "communicat[ed] very well concerning the children" and the children "adapted well" to the joint physical care schedule. By all reports, E.W. and F.W. were "normal, well adjusted, healthy, and happy." Based on these findings, the court ordered the parties to share physical care of the children on a 2-2-3 schedule. As for Ashley's request for half the value of Jacob's farm mortgage debt that was paid during the marriage, the court noted Ashley and Jacob entered into a premarital agreement in which they agreed:

> In the event of a dissolution of marriage, all property, real and personal, owned by each party at the time of the marriage . . . , whether purchased or acquired by gift or inheritance, plus all appreciation in value of such property, shall be and remain the property of such owner without claim by the other party hereto. It is expressly understood that any real estate owned by Jacob Daniel Wieland at the time the marriage, whether individually, or with any other parties, including his father and brother shall remain the

property of Jacob Daniel Wieland in the event of a dissolution of marriage.

Relying on the language of the agreement, the court concluded the phrase reserving to Jacob "all appreciation in value" was meant to include "not only [the] natural appreciation in the fair market value of the real estate but also the appreciation of equity in the property as debt is paid down." Regardless of Ashley's "minimal" work on the farm and whether her income helped pay down the debt (as opposed to the farming operating being self-sufficient), the court stated it would enforce the premarital agreement as written. Finally, the court declined to award either party trial attorney fees.

To respond to the decree, Ashley filed a rule 1.904 motion, asking the court to "reconsider, enlarge, amend, and modify the findings, conclusions, and judgment and decree." In it, Ashley claimed the court's decree "fail[ed] to properly account for domestic abuse." Citing Iowa Code section 598.41(2) and (3), Ashley argued the court "ignored" the December 2019 incident that led to Jacob's guilty plea for domestic abuse assault and, thus, failed to give the appropriate weight to the incident in reaching a physical-care determination. She claimed, "A demonstrated history of physical domestic abuse, accompanied by Jake's history with respect to alcoholism and firearms, warrants the entry of primary care in favor of Ashley consistent with her proposal submitted November 14, 2021."

After Jacob filed a resistance, the district court addressed Ashley's request to amend and enlarge its findings and conclusions of law. The court noted that section 598.41(1)(b) includes a rebuttal presumption against joint *custody* when a history of domestic violence exists, but the parties stipulated to joint legal

custody—the dispute is over physical care. Recognizing the distinction between the two concepts, the court "seriously question[ed] whether a rebuttable presumption against physical care [could] be created under the legislative wording of [section] 598.41(1)(b), when read in conjunction with [section] 598.1(3)," which defines "joint custody" or "joint legal custody." The court proceeded to rule that even "[a]ssuming a history of domestic abuse exists and a rebuttable presumption is created, applying the rebuttable presumption analysis here does not change the result" because "the record supports that both parties, especially when drinking, were very proficient at pushing each other's 'buttons' and their violence toward each other included mutual aggression." The "mutual aggression rebut[ted] any presumption against joint custody and physical care in one party or the other." And, the court reiterated, "now that [the parties] are apart, they are being good parents and acting appropriately and respectably to one another. They are communicating well and acting in the best interests of their children." The court reaffirmed its decision in favor of joint physical care.

Ashley appeals.

## II. Standard of Review.

"In an equity action, such as dissolution of marriage, our review is de novo." *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). "We give weight to the factual determinations made by the district court; however, their findings are not binding upon [this court]." *Id.* (alteration in original) (citation omitted).

**III. Discussion.**

    **A. Physical Care.**

    Ashley challenges the district court's award of joint physical care. As she did in her post-trial motion, Ashley argues the court wrongly applied section 598.41(1)(b) to the facts in this case. She maintains (1) the record establishes a history of domestic abuse with Jacob as the perpetrator and (2) the "rebuttable presumption against the awarding of joint custody" applies equally to legal custody and physical care. Additionally, Ashley lists other facts she believes she established that weigh in favor of awarding her physical care, including that she historically acted as the children's primary caregiver until the entry of the September 2020 order on temporary matters; her stable, long-term employment; dangerous activities in which Jacob allowed the children to engage—including use of an all-terrain vehicle without an adult; and Jacob's failure to safeguard of the children's ADHD medication, which is a controlled substance.

    Like the district court, we find that even if the rebuttable presumption created by a finding a history of domestic abuse applies to the physical-care determination, here the presumption was rebutted. And, while the question of whether the rebuttable presumption against "joint custody" contained in section 598.41(1)(b) applies only to legal-custody—not physical-care—decisions seems to be unanswered, we need not answer that question here.[6] Here, because the

---

[6] In approaching these murky waters, we have found language in cases supporting each side of this argument. *Compare In re Marriage of Ford*, 563 N.W.2d 629, 632 (Iowa 1997) (affirming that section 598.41(1)(b) "merely creates a *rebuttable* presumption against joint custody"), *In re Marriage of Knecht*, No. 10-0240, 2010 WL 3894449, at *3 (Iowa Ct. App. Oct. 6, 2010) (finding the rebuttable presumption involving a history of domestic abuse did not apply in a dispute over the award of

parties stipulated to joint legal custody, coupled with incidents of domestic abuse by both parties, and a recent history of cooperation over parenting, we find the district court properly determined any presumption, if applicable, was rebutted. *See In re Marriage of Forbes*, 570 N.W.2d 757, 760 (Iowa 1997) (providing that "history of domestic abuse," as used in the statute, "is not necessarily established by a single documented incident" and refusing to apply to the presumption because "the record reflects that the abuse was inflicted by both parties"); *In re Marriage of Barry*, 588 N.W.2d 711, 713 (Iowa Ct. App. 1998) (determining that allegations of mutual abusive behavior juxtaposed against the parties' agreement for joint legal custody factored into the consideration of awarding physical care).

Additionally, we think this case is analogous to *In re Marriage of Hynick*, 727 N.W.2d 575, 579–80 (Iowa 2007), in which our supreme court considered whether joint physical care should be awarded when a history of domestic abuse existed in the parents' relationship, and it did not apply a presumption against the award. The court referenced the rebuttable presumption against awarding joint custody before noting the parents had stipulated to joint legal custody. *Hynick*, 727 N.W.2d

---

physical care, but noting the parents agreed to share legal custody), *and In re Marriage of Mulford*, No. 03-1259, 2004 WL 894566, at *2 (Iowa Ct. App. Apr. 28, 2004) (noting the a history of domestic abuse might give rise to a rebuttable presumption of sole custody but that, in the decision over physical care, it is a significant factor to consider as opposed to a presumption), *with Stieneke v. Sargent,* No. 15-1643, 2016 WL 2745058, at *3–4 (Iowa Ct. App. May 11, 2016) (finding evidence of domestic abuse creates a rebuttable presumption against an award of joint custody). And there is the inconsistent language found in *In re Marriage of Hansen*, where the court determined that "Iowa Code section 598.41(3) does not directly apply to *physical care* decisions" but also said after citing this same section, that "[e]vidence of untreated domestic battering should be given considerable weight in determining custody and gives rise to a presumption against joint physical care." 733 N.W.2d 683, 696, 698 (Iowa 2007).

at 579–80. The court did not ignore the history of domestic abuse when determining the appropriate physical-care award; it noted it was a "significant factor" in the decision because it "reflect[ed] the ability of the parties to listen to one another and respect one another's opinions and feelings." *Id.* at 579. But the court did not start with a presumption against joint physical care, instead holding that "[w]hen parents agree to joint custody, the court need not consider the factors set for in section 598.41(3)." *See id.* And, as in *Hynick,* the district court here did not ignore the domestic abuse history but instead examined how the relationship between the parents impacted the communication and respect for each other required in a joint physical care arrangement. *See id.*

So, again like the district court, we employ our typical framework in deciding whether joint physical care is in the best interests of the parties' children. In making our determination, we consider the factors in section 598.41(3). *Hansen*, 733 N.W.2d at 696 (recognizing that while section 598.41(3) factors do not directly apply to physical-care decisions, the factors "are relevant in determining whether joint physical care is in the best interest of the child"). We also consider (1) stability, continuity, and approximation; (2) the ability of the parents to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) the degree to which the parents are in general agreement about their approach to daily matters. *Id.* at 697–99. As always, the best interest of the children is our North Star. Iowa R. App. P. 6.904(3)(o). As we undertake our analysis, we remember that "[p]hysical care issues are not to be resolved based upon perceived fairness to the *spouses,* but primarily upon what is best for the *child*[*ren*]." *Hansen*, 733 N.W.2d at 695. And "[t]he objective of a physical care determination is to place

the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.*

While Ashley was more often home with the children and provided the bulk of their care when they were younger due to Jacob's employment as an over-the-road truck driver, she did not dispute that Jacob has always participated in caring for the children when he was home, including cooking, cleaning, engaging in activities with E.W. and F.W, and taking the children to medical appointments as needed. *See id.* at 697 ("[T]he quality of the parent-child relationship is not always determined by hours spent together or solely upon past experience."). The guidepost for this first *Hansen* factor of approximation involves an attempt to craft a caregiving schedule "in the post-divorce world" that is "in rough proportion to that which predated the dissolution." *Hansen*, 733 N.W.2d at 697.

Following the breakdown of the parties' marriage, Jacob intentionally took a different job that allowed him to work in the area and provided him better hours to co-parent. Although imposed by the court in the truncated temporary-order process,[7] the parents shared joint physical care on a 2-2-3 schedule from the entry of the September 2020 order on temporary matters through the November 2021 dissolution trial and, according to all witnesses including Ashley, the children did well educationally and socially during this period of having equal time with their parents. Thus, it is no surprise the temporary joint-physical-care arrangement was successful since it did not significantly contrast from the children's past experience.

---

[7] *See* Iowa Code § 598.11(1) ("The hearing on the application [for a temporary order] shall be limited to matters set forth in the application, the affidavits of the parties, and the required statements of income.").

*See id.* ("[I]mposing a new physical care arrangement on children that significantly contrasts from their past experience can be unsettling, cause serious emotional harm, and thus not be in the child's best interest.").  When asked, Ashley described the children as mostly healthy and happy and agreed they had "adjusted well to living in two households."  So the temporary test of the arrangement succeeded by most accounts.

The parties did not always communicate well during their relationship, but those issues did not persist after the parties' separation.  At trial, Ashley introduced into evidence exhibit K, a 278-page exhibit containing every text message between Jacob and Ashley from December 25, 2019 until October 30, 2021.  When asked about the exhibit, Ashley testified:

> Q. And what are you communicating about in these text messages with Jake?  A. The kids, finances, taxes.
> Q. Do most of these text messages concern co-parenting matters?  A. Absolutely.
> Q. And with very limited exception, have any communications been pointed out by anybody as demonstrating a lack of co-parenting?  A. I don't believe so.
> Q. Have you followed the [c]ourt's order in this case with respect to co-parenting matters?  A. I believe so.
> Q. Have you been able to communicate with Jake with respect to the extracurricular activities?  A. Yes.

The parents were able to share necessary information about the children without issue, and neither parent has attempted to poison the well as to the other parent.

As for the degree of conflict between these parents, the district court is right—they are "gunpowder and flint together."  We do not minimize the December 2019 incident that led to Jacob pleading guilty to domestic abuse assault.  Nor do we ignore that this was not the couple's only physical altercation.  These are serious incidents, and we give them significant weight in our analysis.  Still, like the

district court, we identify a big shift in the parents' level of conflict before and after their separation. And, importantly, Ashley does not harbor fear of Jacob.[8] *See id.* at 698 ("Where the parties' marriage is stormy and has a history of charge and countercharge, the likelihood that joint physical care will provide a workable arrangement diminishes. It is, of course, possible that spouses may be able to put aside their past, strong differences in the interest of the children.").

Finally, Ashley and Jacob seem to be on the same page about parenting E.W. and F.W. As part of their stipulation, they agreed in which school district the children will attend. And, after they separated but before trial, the parents were able to agree on the children's extracurricular activities. As of the time of the dissolution trial, both parents lived in a rural setting only a few miles apart, and each parent intends to stay in the same community. Ashley and Jacob approach disciplining the children the same way and, through their testimony about their day-to-days lives, both showed the significance they place on having close relationships with their family members who live nearby.

While the parents' marriage was, at times, tumultuous, Ashley and Jacob established they were able to co-parent E.W. and F.W. during the period leading up to the dissolution trial, and their children are better off because of it. We agree with the district court that joint physical care is in the best interest of these children.

---

[8] Ashley explicitly stated this in her testimony, and evidence showing Ashley chose to sit near Jacob at a community sporting event supports it. Additionally, Ashley agreed Jacob never violated the no-contact order, and she allowed it to expire without seeking renewal.

**B. Farm Equity.**

In an effort to add to her side of the property distribution payout, Ashley pointed to the increase in farm equity that occurred over the years of the marriage. Jacob and his brother each own a 50% interest in the farm. During the parties' marriage, the debt on that farm was reduced from $192,000 to $66,528, which is a difference of $125,472. Jacob was responsible for half of the reduction, or $62,736. As she did at the district court, Ashley asks for credit of half of that amount ($31,368), arguing it was marital funds that paid down the debt so it is inequitable to allow Jacob to retain all of the benefit.

The district court denied Ashley's request, relying on language in the parties' premarital agreement[9] that stated "all property . . . plus all appreciation in the value of such property . . . shall be and remain the property of" the party who owned the property at the time of the marriage. The court reasoned that the phrase "all appreciation in the value of such property" to include "the appreciation of equity in the property as the debt is paid down." We agree that Ashley is not entitled to a credit for the equity buildup, but for different reasons.

First and foremost, Ashley does not challenge the enforceability or validity of the premarital agreement. As we understand her argument, she suggests that Jacob's debt, allegedly paid with marital funds, does not fall within the "appreciation in the value of the property" contemplated by the agreement. And, alternatively, she argues allowing Jacob to retain all of the benefit of the use of

---

[9] Iowa Code § 596.1(1) provides: "'Premarital agreement' means an agreement between prospective spouses made in contemplation of marriage and to be effective upon marriage."

marital funds is inequitable. Although she does not articulate it this way, granting Ashley's request would require us to recognize a distinction between Jacob's (presumably) increased equity in the property due to paying down of the mortgage debt[10] and any increase in value of the property due to changed market conditions. But she does not point us to any authority to support this distinction, and the terms of the parties' premarital agreement do not take us there.

So, with no challenge to the premarital agreement, we look to its terms. *See In re Marriage of Rhoten*, No. 17-0889, 2019 WL 1056831, at *2 (Iowa Ct. App. Mar. 6, 2019) ("In general, premarital agreements 'are favored in the law and should be construed liberally to carry out the intention of the parties.'" (quoting *In re Marriage of Van Brocklin*, 468 N.W.2d 40, 45 (Iowa Ct. App. 1991))). Prior to the marriage and in the agreement, Jacob disclosed his ownership in the farmland and the mortgage debt existing against the property. The premarital agreement specifically provided that it was the intent of the parties "to define the interest which each shall have or acquire as to the property of the other . . . during and after their marriage." With that pronouncement, the parties further stipulated that they would not assert a claim to any right or interest in the real property of the other, "*except as otherwise herein provided*" and they released each other and the property from any such claim or demand "*arising out of or as a result of the termination of such marriage*." (Emphasis added.) Ashley points to no provision of the premarital agreement that allows her credit for sums paid down on the mortgage in the event

---

[10] While the record contains information of the amount of mortgage debt on the farm at the time of marriage and then at the time of dissolution, we do not have evidence of the farm's value at the time of the dissolution trial.

of a dissolution of the marriage. She seems to forget that allowing her a share of equity in the real estate is a claim to a right or interest in the real property. *See* Iowa Code § 596.1(2) (defining property as "an interest, present or future, legal or equitable, vested or contingent, in real . . . property").

Even if we were to consider Ashley's argument that marital funds paid down the mortgage and gave Jacob a windfall at her expense, the record does not support her theme. As Jacob pointed out, the evidence presented at trial showed funds deposited by Ashley from her personal account were almost equal to the monies transferred back out of the account to Ashley. Further, Jacob testified the farm debt was paid by money generated by the farm. Plus, Ashley benefitted from the farm account funds that paid cell phone bills, the internet service, and the vehicle insurance. Because the district court's allocation of Jacob's interest in the farm was pursuant to the binding agreement, we do not consider whether that specific allocation was equitable. *See, e.g.*, *In re Marriage of Gonzalez*, 561 N.W.2d 94, 96 (Iowa Ct. App. 1997) ("We treat [prenuptial] agreements in the same manner as ordinary contracts."); *see also* Iowa Code § 598.21(5) (requiring the court to consider a number of factors when dividing the parties' property, including the provisions of an antenuptial agreement). We affirm the district court's treatment of the farm equity in the property division.

**C. Appellate Attorney Fees.**

Jacob asks us to award him $8000 in appellate attorney fees. Appellate attorney fees in a dissolution-of-marriage action are not awarded as a matter of right but rather rest in our discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). In deciding whether to award them, we consider "the needs of

the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.*

While Jacob has been wholly successful in defending this appeal, based on the district court's determination of the parties' respective incomes,[11] he earns nearly twice as much as Ashley each year. Focusing on his need and her ability to pay, we decline to award Jacob any appellate attorney fees.

**AFFIRMED.**

---

[11] The district court made this determination for the purpose of setting a child-support obligation. Neither party challenged these determinations on appeal.